**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 24 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

        v.

ASTA M. ELLIOTT,

    Defendant-Appellant.

No. 96-8061

Appeal from United States District Court
for the District of Wyoming
(D.C. No. 96-CR-2)

William M. Hatchett, of Pontiac, Michigan, for the appellant.

John R. Green, Assistant United States Attorney, of Cheyenne, Wyoming (David D. Freudenthal, United States Attorney for the District of Wyoming, with him on the brief), for the appellee.

Before ANDERSON, McWILLIAMS, and BRISCOE, Circuit Judges.

BRISCOE, Circuit Judge.

       Defendant Asta M. Elliott, convicted and sentenced for possession of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), appeals the denial of her motion to suppress evidence. We reverse and remand.

I.

On the morning of December 14, 1995, Wyoming Highway Patrolman Dan Dyer was sitting in his patrol car in the median of Interstate 80 near Laramie, Wyoming, monitoring eastbound traffic. At approximately 7:40 a.m., he saw a Mercury Marquis traveling east on the interstate and became suspicious for several reasons. First, the Mercury was traveling 55-60 mph in a 75-mph zone, but was "not smoking or belching or jerking down the road." Append. at 8. Second, the two occupants of the Mercury looked straight ahead instead of at Dyer as they passed. Finally, he noticed there was no front license plate and he thought it might be an out-of-state car. Based on these suspicions, Dyer drove his car onto the interstate and followed the Mercury. As the two cars traveled through winding sections of the interstate, Dyer noticed the Mercury came close to, but did not enter, the emergency lane. When the interstate straightened, the Mercury speeded up to approximately 77-78 mph. Dyer locked in his radar at 77 mph, turned on his patrol car's overhead lights, and stopped the Mercury.

Dyer approached the Mercury on foot and informed Elliott, the driver, that the Mercury had been traveling 77-78 mph. She responded that her speedometer might be slightly off because she had just purchased new tires. Dyer told Elliott he would give her a warning ticket. Dyer asked Elliott and her female passenger, Shirley Thom, where they had been and for how long. After a pause, Thom replied they had been in Las Vegas for four or five days. Dryer asked Elliott for her driver's license, car registration, and proof of insurance. Elliott promptly produced the documents and Dyer went to his car and confirmed everything was proper. Dyer returned Elliott's license, registration, and proof of insurance. Before handing her the warning ticket, he told Elliott he could have written

-2-

her a $65 ticket. Elliott replied, "Thanks a lot. We'll try to watch our speed." Append. at 15. According to Dyer, he thought Elliott "had been polite, quite polite, maybe a little more than normal." Id.

After handing the warning ticket to Elliott, Dyer asked her, "Say, there's nothing illegal in the vehicle, in the trunk by chance?" Id. Elliott responded in the negative. Dryer asked Elliott if he could "look through the trunk there and see what you got in there? I don't want to look through each item." Id. at 19. Dyer told Elliott he just wanted to see how things were "packed" or "packaged." Id. at 51, 63. Elliott pushed a button in the glove box and opened the trunk. Dyer observed the trunk was full of luggage. He pushed and felt the outside of a black nylon bag on the left side of the trunk and noticed there was "the same rigidity throughout the whole [bag]." Append. at 20. Dyer then unzipped the bag approximately 5-7 inches and observed a package inside wrapped in paper or other material with little red dots on it. According to Dyer, he had previously seen similar packaging in a drug case.

Dyer walked back to the driver's door of the Mercury and asked Elliott if she would accompany him to the trunk while he looked in the bags. More specifically, Dyer asked: "Would you mind coming out? Get your coat and hat, if you wouldn't mind, please, and come on back. And I don't want to be accused of taking anything back here." Append. at 22. Elliott complied with Dyer's request. Dyer pointed to the partially-opened black bag in the trunk and asked whose it was. He initially received no response, but eventually Elliott acknowledged it was hers. Dyer asked Elliott, "What's in it?" Append. at 23. Elliott replied that she did not know. Dyer completely unzipped the bag and asked Elliott, "Well, do you mind if I get a pocketknife and make a little cut there in that bag

[*i.e.*, the package]?" Id.  After Elliott agreed, Dyer retrieved his pocketknife from his patrol car and made a small incision in the package, revealing a green leafy substance that looked and smelled like marijuana.

Dyer told Elliott to stand by the front of the patrol car while he radioed for assistance.  Dyer then returned to the Mercury, removed the keys, and asked Thom for identification.  Dyer subsequently placed Elliott under arrest and *Mirandized* her.  The Mercury was towed to patrol headquarters in Laramie and its contents were inventoried.  Approximately 174.5 pounds of marijuana were found in the bags in the trunk.

Elliott was charged with one count of possession of marijuana with intent to distribute on December 20, 1995.  She waived her right to indictment and was charged by information on January 17, 1996, with the same count.  On February 12, 1996, she filed a motion to suppress evidence, and the motion was denied on March 22, 1996.  Elliott entered a plea of guilty on April 15, 1996, conditioned on her right to appeal the denial of her motion to suppress.  She was sentenced to thirty months' imprisonment, three years' supervised release, and a special assessment of $50.  Elliott filed her notice of appeal on July 1, 1996.

II.

Elliott contends the district court erred in denying her motion to suppress, arguing she did not voluntarily consent to Dyer looking in the trunk of her car because he did not tell her she was free to go after he returned her driver's license and other papers.  Further, Elliott argues, even if her consent was voluntary, Dyer exceeded the scope of her consent by touching and feeling the bag and by unzipping it to view the package contained therein.

When reviewing an order granting or denying a motion to suppress, we accept the district court's factual findings unless clearly erroneous, and view the evidence in the light most favorable to the district court's findings. United States v. Foster, 100 F.3d 846, 849 (10th Cir. 1996); United States v. Hernandez, 93 F.3d 1493, 1498 (10th Cir. 1996). "Evaluation of the credibility of witnesses, the weight to be given the evidence, and inferences to be drawn from the evidence are for the district court." Hernandez, 93 F.3d at 1498. However, we review de novo the ultimate determination of the reasonableness of a search under the Fourth Amendment. Foster, 100 F.3d at 849; Hernandez, 93 F.3d at 1498.

**Voluntariness of Consent**

A law enforcement officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. When the driver has produced a valid license and proof of entitlement to operate the car, the driver must be allowed to proceed without further delay for additional questioning. United States v. Gonzalez-Lerma, 14 F.3d 1479, 1483 (10th Cir.), cert. denied 114 S. Ct. 1862 (1994). Further questioning is permissible, however, if (1) "during the course of the traffic stop the officer acquires an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity"; or (2) "the driver voluntarily consents to the officer's additional questioning." United States v. Sandoval, 29 F.3d 537, 540 (10th Cir. 1994). Under the first set of circumstances, "a Fourth Amendment seizure has taken place, but it is reasonable and consequently constitutional." Id. Under the second set of circumstances, "there is no seizure, and hence the Fourth Amendment's strictures are not implicated." Id. However, if the officer continues to question the driver in the absence of

either set of circumstances, any evidence derived from that questioning (or a resulting search) "is impermissibly tainted in Fourth Amendment terms." Id.

Here, the government has not argued that Dyer had an objectively reasonable and articulable suspicion that Elliott was engaged in criminal activity. Although Dyer's testimony at the suppression hearing certainly suggests he had a "hunch" that Elliott might be involved in illegal activity, an officer's "inchoate and unparticularized suspicion or 'hunch'" is insufficient to give rise to reasonable suspicion. United States v. Sokolow, 490 U.S. 1, 7 (1989). Accordingly, the legality of Dyer's questioning (about illegal items in the car) and the voluntariness of Elliott's consent to allow Dyer to look in the trunk hinge on whether and when the detention associated with the traffic stop ended.

In determining whether a driver and police officer are engaged in a consensual encounter in the context of a traffic stop, there are few, if any, bright-line rules. Ohio v. Robinette, 117 S.Ct. 417, 421 (1996). Instead, the court must focus on the totality of the circumstances in a particular case. Id. (emphasizing "fact-specific nature of the reasonableness inquiry"). In particular, "a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." Sandoval, 29 F.3d at 540 (quoting Florida v. Bostick, 501 U.S. 429, 439 (1991)).

The facts in United States v. Werking, 915 F.2d 1404 (10th Cir. 1990), are strikingly similar to those here. In Werking, Patrolman Dyer (the same officer) stopped an out-of-state vehicle for a suspected traffic violation, and requested and received the driver's papers. After determining there was no traffic violation and finding no problems

with the driver's papers, Dyer returned the papers and then asked the driver if he was transporting firearms, narcotics, or large sums of money in the car. The driver replied in the negative, but Dyer asked if he could take a look in the trunk of the car. The driver agreed and, during a search of the trunk, Dyer found 75 pounds of marijuana in nylon duffle bags. After the district court rejected his motion to suppress evidence, the driver entered a conditional plea and filed a notice of appeal challenging the district court's ruling on his motion to suppress. On appeal, we held that "[t]he initial investigative detention was concluded when Dyer returned [the driver's] license and registration papers." 915 F.2d at 1408. Accordingly, we concluded the subsequent encounter between Dyer and the driver (*i.e.*, questioning about illegal items and the resulting search) was consensual. Id.

Since Werking, we have consistently concluded that an officer must return a driver's documentation before a detention can end. See United States v. Gregory, 79 F.3d 973, 979 (10th Cir. 1996). However, we have specifically indicated this is not always sufficient to demonstrate that an encounter has become consensual. Id.; Sandoval, 29 F.3d at 540; United States v. McKneely, 6 F.3d 1447, 1451 (10th Cir. 1993); United States v. Turner, 928 F.2d 956, 959 (10th Cir.), cert. denied, 502 U.S. 881 (1991); see also United States v. McSwain, 29 F.3d 558, 563 (10th Cir. 1994). For example, in Turner, this court suggested the return of a driver's documents would not end the detention if there was evidence of a "coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled." 928 F.2d at 959. Similarly, in McKneely, we stated the return of documentation would render

a subsequent encounter consensual only if "a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information." 6 F.3d at 1451.

Here, it is uncontroverted that Dyer returned Elliott's documentation to her before asking if she had anything illegal in her car. Although Dyer did not inform Elliott she was free to leave, there is no indication his questioning was accompanied by any coercive show of authority (*e.g.*, leaning on Elliott's car, using a commanding tone of voice, physically touching Elliott, showing or touching weapon, etc.). Dyer, the only witness at the suppression hearing, specifically testified he was not leaning on or touching Elliott's car, his demeanor was normal, he did not make any threats toward Elliott or her passenger, and he made no gestures toward his holster. We therefore conclude that, once Dyer returned the documentation to Elliott, the detention became "an ordinary consensual encounter between a private citizen and a law enforcement official." Werking, 915 F.2d at 1408. Accordingly, we conclude Elliott's consent to the search was voluntarily given and was not obtained in violation of the Fourth Amendment.

**Scope of Elliott's Consent**

The second part of the inquiry is whether the search conducted by Dyer exceeded the scope of Elliott's consent. The scope of a search "is generally defined by its expressed object," Florida v. Jimeno, 500 U.S. 248, 251 (1991), and "is limited by the breadth of the consent given." United States v. McRae, 81 F.3d 1528, 1537 (10th Cir. 1996) (quoting United States v. Pena, 920 F.2d 1509, 1514 (10th Cir.1990), cert. denied, 501 U.S. 1207 (1991)). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness--what would the typical

reasonable person have understood by the exchange between the officer and the suspect."
Jimeno, 500 U.S. at 251. Accordingly, the question here is whether the typical reasonable person would think, based upon the exchange between Elliott and Dyer, that Elliott consented to Dyer touching and unzipping one of the bags in the trunk. In deciding this question, we view the evidence in the light most favorable to the government. McRae, 81 F.3d at 1537.

The evidence of what transpired between Dyer and Elliott is uncontroverted. At the suppression hearing, Dyer testified that he asked Elliott if he could "look through the trunk there and see what you got in there? I don't want to look through each item." Append. at 19. He also testified that he told Elliott he just wanted to see how things were "packed" or "packaged." Id. at 51, 63. According to Dyer, Elliott responded by opening the glove box in her car and releasing the trunk latch.

Dyer's first question to Elliott could reasonably be construed as asking for consent to search the trunk and its contents. Specifically, his request to "look through the trunk," considered by itself, would have conveyed to a "typical reasonable person" that Dyer was interested in searching the trunk and its contents. Similar wording used by officers in other cases has typically been construed to allow full searches of automobiles. For example, in McRae, we concluded a defendant's consent to an officer's request to "look in" his car gave the officer authorization to search the car, including lifting up carpeting in the trunk of the car. 81 F.3d at 1537-38. Likewise, in United States v. Espinosa, 782 F.2d 888, 892 (10th Cir.1986), we concluded a defendant's consent to an officer's request to "look through" the defendant's automobile authorized the officer to conduct a thorough search of the vehicle (however, defendant watched as officer searched car, and officer

specifically requested consent to look through defendant's luggage). See also United States v. Stewart, 93 F.3d 189, 192 (5th Cir. 1996) (defendant's consent to officer's request to "look at" medicine bottle authorized officer to look in bottle); United States v. McSween, 53 F.3d 684, 687 (5th Cir.) (defendant's consent to officer's request to "look in" defendant's car and trunk gave officer authorization to look under hood area as well), cert. denied, 116 S.Ct. 199 (1995); United States v. Rich, 992 F.2d 502, 506 (5th Cir.) (defendant's consent to officer's request to "look in" trunk gave officer authorization to look inside suitcase in trunk), cert. denied, 510 U.S. 933 (1993).

Significantly, however, Dyer did not stop with his first question. Instead, he told Elliott that he did not "want to look through each item." Further, he explained to her that he just wanted to see how things were "packed" or "packaged." We conclude that a typical reasonable person would have construed these additional statements as expressly limiting the scope of Dyer's request. The district court concluded that a typical reasonable person would have understood Dyer's statements to mean he wanted not only to look in the trunk but also to examine and open any "packages" that he found there. The court further concluded that implicit in Dyer's subsequent statements was his "desire to examine some of the things" in the trunk. To us, Dyer's statements, considered in their entirety, would have conveyed to a reasonable person that Dyer was interested only in visually inspecting the trunk and its contents, and did not convey his intent to look into any containers in the trunk. See 3 Wayne R. LaFave, Search and Seizure § 8.1(c), at 620 (3d ed. 1996) ("When a purpose is included in the [officer's] request, then the consent should be construed as authorizing only that intensity of police activity necessary to accomplish the stated purpose.").

Because he expressly and narrowly limited the scope of his request, it is apparent that Dyer exceeded the scope of Elliott's consent and thereby violated her Fourth Amendment rights by unzipping and looking inside one of the bags in the trunk. Accordingly, we conclude Elliott's motion to suppress evidence should have been granted.

The judgment of the district court is REVERSED, and the cause is REMANDED with instructions to vacate the conditional plea and grant the motion to suppress evidence.