**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 22 2003**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JOHN J. CERVINE,

Defendant - Appellant.

No. 02-3169

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D. Ct. No. 00-CR-40024-21-SAC)**

---

Submitted on the briefs: *

David S. Rauzi, Law Offices of David S. Rauzi, Kansas City, Missouri, appearing for Appellant.

Eric F. Melgren, United States Attorney, Nancy Landis Caplinger, Assistant United States Attorney, Office of the United States Attorney, Topeka, Kansas, appearing for Appellee.

---

Before **TACHA** , Chief Circuit Judge, **EBEL** and **BRISCOE** , Circuit Judges.

---

*After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

**TACHA** , Chief Circuit Judge.

During a canine search of Appellant-Defendant John Cervine's vehicle, conducted after a stop for a traffic violation, Missouri Highway Patrol troopers discovered marijuana and methamphetamine. Mr. Cervine pleaded guilty to one count of conspiring to manufacture and distribute a controlled substance, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2, and one count of possessing, with the intent to distribute, approximately 53.2 grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. In his plea agreement, Mr. Cervine reserved the right to appeal the district court's ruling on his motion to suppress the evidence obtained from the traffic stop of his truck and from his subsequent questioning. The district court denied the motion, finding that the troopers' conduct did not violate the Fourth Amendment. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.

## I. Background

Missouri state troopers arrested John Cervine on March 11, 2000, during his return trip home to Kentucky from Baxter Springs, Kansas. Mr. Cervine originally traveled to Baxter Springs to visit Timothy Cline, an Oklahoma resident and owner of Biker's Dream, a motorcycle sales and repair shop in Baxter Springs. DEA agents had been investigating Timothy Cline as a possible

methamphetamine distributor and pseudoephedrine supplier since late 1999. Based on information derived from their investigation, including wiretaps of telephone calls on March 7-11, 2001, DEA agents had reason to believe that Mr. Cervine was involved with Mr. Cline in trafficking illegal drugs.

On March 11, 2000, Mr. Cervine telephoned Timothy Cline upon arriving in the Baxter Springs area. After first meeting Mr. Cline at his Oklahoma home, Mr. Cervine drove to Baxter Springs, arriving at Biker's Dream at approximately 1:00 p.m. After about five hours, Mr. Cervine left the shop in his truck, with his motorcycle in tow, apparently en route to Kentucky.

DEA agents followed Mr. Cervine from Baxter Springs into Missouri and observed him on two occasions drive at a slow speed through two rest areas without stopping, returning directly to the interstate. The DEA agents testified that narcotics traffickers commonly adopt such behavior as a counter-surveillance technique.

After observing this behavior, the DEA agents contacted the Missouri Highway Patrol, informing them that Mr. Cervine was likely transporting illegal drugs. The DEA agents also requested that the Highway Patrol stop the vehicle for any observed traffic violations and seek permission from Mr. Cervine to search the vehicle. After locating Mr. Cervine's vehicle, Highway Patrol troopers Scott Mease and Cort Stuart observed his truck veer over the line separating the

left passing lane from the right driving lane for approximately two seconds before returning fully to the right lane. The Highway Patrol officers stopped Mr. Cervine for this violation. Mr. Cervine did not deny committing the violation, claiming that deficient tongue weight in his towed trailer caused the vehicle to swerve.

After approaching the truck and informing Mr. Cervine of the basis for the stop, Highway Patrol Trooper Mease requested his driver's licence. Upon receiving this license, Trooper Mease asked Mr. Cervine to accompany him to his patrol car. Mr. Cervine complied. After denying that he was transporting illegal drugs in his vehicle, Mr. Cervine gave the troopers permission to search his truck.

Instead of searching the vehicle themselves, the troopers called in the canine unit to perform the search. Although Mr. Cervine claims that the canine unit did not arrive for approximately three hours, the troopers claim that it arrived within thirty minutes.

A few minutes after arriving, the dog alerted the troopers to the truck's console, where they located marijuana and methamphetamine in vacuum-sealed packages. Trooper Mease then arrested Mr. Cervine and read him his *Miranda* rights. Once at Troop D headquarters, Mr. Cervine answered questions posed to him by Missouri Highway Patrol officers.

## II.  Discussion

### A.  Standard of Review

In reviewing the denial of a motion to suppress evidence, we accept the factual findings of the district court, and its determination of witness credibility, unless they are clearly erroneous.  *See United States v. Flores*, 48 F.3d 467, 468 (10th Cir. 1995), *cert. denied*, 516 U.S. 839 (1995).  We review the evidence in the light most favorable to the finding of the district court and review de novo the ultimate determination of reasonableness under the Fourth Amendment.  *See United States v. Gregory*, 79 F.3d 973, 977 (10th Cir. 1996).

### B.  Overview of Applicable Fourth Amendment Law

In reviewing the constitutionality of traffic stops under the Fourth Amendment, we conduct a two-step inquiry.  First, we must determine "whether the officer's action was justified at its inception."  *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir. 1994).  Second, we must consider "whether the action was reasonably related in scope to the circumstances that first justified the interference."  *Id.*  "An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation."  *Id*.  After completion of these activities, an officer may detain a driver for reasons unrelated to the initial traffic stop if (1) the officer has "an objectively reasonable and articulable suspicion that illegal activity has occurred

or is occurring[,]" or (2) "if the initial detention has become a consensual encounter." *Id.* (citations omitted).

C.      Reasonableness of the Traffic Stop at Its Inception

"[A] detaining officer must have     an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring before stopping [an] automobile." *United States v. Soto*   , 988 F.2d 1548, 1554 (10th Cir. 1993) (citation omitted).  Here, Trooper Mease testified that the truck driven by Mr. Cervine crossed the line dividing the driving and passing lanes for approximately two seconds.  Trooper Mease claimed that he stopped Mr. Cervine for violating Mo. Rev. Stat. § 304.015.6, which states:

> All vehicles in motion upon a highway having two or more lanes of traffic proceeding in the same direction shall be driven in the right-hand lane except when overtaking and passing another vehicle or when preparing to make a proper left turn or when otherwise directed by traffic markings, signs or signals.

Mr. Cervine counters that the troopers did not have probable cause     [2] because "crossing over the lane divider for two seconds cannot objectively constitute a

---

[2] Mr. Cervine uses the terms "probable cause" and "reasonable suspicion" interchangeably throughout his brief.  However, our case law makes clear that "[w]hile either probable cause or reasonable suspicion is sufficient to justify a traffic stop, only the lesser requirement of reasonable suspicion is necessary." *United States v. Callarman*, 273 F.3d 1284, 1287 (10th Cir. 2001).  Thus, the relevant inquiry is whether the troopers had *reasonable suspicion* to stop the car driven by Mr. Cervine.

violation" of Mo. Rev. Stat. § 304.015.6. [3] We disagree.

To support his argument, Mr. Cervine points to our holding in *United States v. Gregory*, 79 F.3d 973 (10th Cir. 1996). In *Gregory*, the defendant, while driving a U-Haul truck through a windstorm, swerved one time into an emergency lane on a windy, mountain road. We held that the officer did not have reasonable suspicion to support a traffic stop because this action did not violate Utah law. *Id.* at 978. Mr. Cervine contends that the similarity of vehicles and driving conditions here and in *Gregory* requires a comparable holding in this case.

Mr. Cervine misreads our decision in *Gregory*. For purposes of establishing reasonable suspicion, we only consider vehicle and weather conditions when the underlying state statute so directs. We considered these conditions in *Gregory* because the underlying Utah statute contained an-as-nearly-as-practical requirement. The relevant statute in *Gregory*, Utah Code Ann. § 41-6-61(1), requires that "[a] vehicle shall be operated *as nearly as practical* entirely within a single lane . . . ." *Id.* (emphasis added). Given the difficult

---

[3] Mr. Cervine also argues, without any evidentiary support, that Trooper Mease believed that Mr. Cervine violated Mo. Rev. Stat. § 314.015.5(1) and that this alleged violation supplied the actual basis for the traffic stop. Trooper Mease testified, however, that Mr. Cervine's apparent violation of Mo. Rev. Stat. § 304.015.6 formed the basis of his traffic stop. Mr. Cervine provided no contrary evidence. The district court accepted the testimony of Trooper Mease. *United States v. Cervine*, 169 F. Supp. 2d 1204, 1210-11 (D. Kan. 2001). We accept the district court's factual findings on this issue. *Flores*, 48 F.3d at 468.

weather, vehicle, and road conditions, it was not "practical" for the driver in *Gregory* to avoid the emergency lane at all times. *See Gregory*, 79 F.3d at 978; *State v. Bello*, 871 P.2d 584, 587 (Utah. Ct. App. 1994) (holding that one instance of weaving does not constitute a violation of Utah Code Ann. § 41-6-61(1)). Thus, in *Gregory*, we recognized nothing more than the fact that because the driver did not violate the Utah statute, no basis existed for the officer to form the reasonable suspicion necessary for the traffic stop in question.

In contrast to the Utah statute, Mo. Rev. Stat. § 304.015.6 does not allow drivers to comply with the right-lane requirement "as nearly as practicable." Instead, the Missouri statute sets forth only three conditions under which vehicles may enter the left-hand lane: (1) "when overtaking and passing another vehicle"; (2) "when preparing to make a proper left turn"; and (3) "when otherwise directed by traffic markings, signs, or signals." [4] *Id*. Unlike Utah Code Ann. § 41-6-61(1), a driver violates Mo. Rev. Stat. § 304.015.6 if his vehicle enters the left-hand lane for any reason other than the three justifications enumerated in the statute. The Missouri statute does not include an exception for improper vehicle weight, driver visibility, or wind. Thus, regardless of the wind, the darkness, or the weight of his trailer, when Mr. Cervine's truck entered the left lane, he violated Mo. Rev.

---

[4] Mr Cervine does not contend that he crossed into the left-hand lane for any of these three recognized conditions.

Stat. § 304.015.6. [5]

This violation provided the troopers with reasonable suspicion to stop Mr. Cervine's car. The fact that the troopers had other motivations for stopping Mr. Cervine has no bearing upon this review. "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996). "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) ( *en banc* ). Thus, once the Trooper observed a traffic violation, such as swerving across the lane dividing line in violation of Mo. Rev. Stat. § 304.015, the subsequent traffic stop was valid. Accordingly, we find our decision in *Gregory* inapposite here and hold reasonable the initial traffic stop of Mr.

---

[5] The Missouri Court of Appeals in *State v. Mendoza*, 75 S.W.3d 842 (Mo. Ct. App. 2002), found that a driver did not violate Mo. Rev. Stat. § 304.015.6 when his vehicle moved into the left lane while passing a parked patrol car, after which it returned promptly to the right lane. Accordingly, in *Mendoza*, no reasonable suspicion existed for stopping the vehicle. This holding, however, rested on the fact that "§ 304.015.6 does not specifically proscribe" moving into the left lane to pass a vehicle parked in the shoulder. *Id.* at 846. In fact, Mo. Rev. Stat. § 304.015.6 explicitly permits drivers to enter the left lane to "pass[] another vehicle" without distinguishing between moving and non-moving vehicles. *Id.* Therefore, unlike the swerving of the vehicle in the present case, the driver's use of the left lane in *Mendoza* specifically fell within the realm of action permitted under the statute.

Cervine. [6]

D.    Reasonable Suspicion of Illegal Activity as the Basis for the Canine Search

"Generally, an investigative detention must 'last no longer than is necessary to effectuate the purpose of the stop.'" *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Under ordinary circumstances, this limits the officer to a request for the driver's license and registration, a computer check on the car and driver, an inquiry about the driver's travel plans, and the issuance of a citation. *See, e.g., United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001).

Generally, "[i]f the driver produces a valid license and proof of right to operate the vehicle, the officer must allow him to continue on his way without delay for further questioning." *Soto*, 988 F.2d at 1554 (quoting *United States v. Pena*, 920 F.2d 1509, 1514 (10th Cir. 1990)). The officer, however, may extend this detention for reasons unrelated to the traffic stop under two circumstances: (1) if the officer has "an objectively reasonable and articulable suspicion that

---

[6]We do not hold that a suspect must commit a traffic violation before officers may stop a vehicle to investigate drug trafficking. Because the government did not argue that the troopers stopped Mr. Cervine based on the objective, reasonable, and articulable suspicion of drug trafficking as communicated to them by the DEA, absent any traffic violation, we had no occasion to consider that argument. *See United States v. Celio*, 945 F.2d 180 (7th Cir. 1991) (holding state troopers may stop suspected drug traffickers without violating the Fourth Amendment based solely on request from DEA to stop a suspected vehicle).

illegal activity has occurred or is occurring"; or (2) "if the initial detention has become a consensual encounter." *Gonzalez-Lerma*, 14 F.3d at 1483 (citations omitted).

The district court found that Mr. Cervine did not validly consent to the search of his vehicle and the related detention because the troopers did not return his driver's license to him prior to obtaining consent. *See Cervine*, 169 F. Supp. 2d at 1212 (citing *United States v. Gonzales-Lerma*, 14 F.3d 1479, 1483 (10th Cir. 1994)). The United States does not contest this determination on appeal. Therefore, the troopers conducted a proper detention only if they had "a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotations omitted). In making this determination, we must examine the totality of the circumstances, meaning that reasonable suspicion may exist even if "each of the[] factors alone is susceptible of innocent explanation." *Id*. at 277.

In the present case, it is uncontroverted that the initial traffic stop itself did not provide reasonable suspicion for the further detention and search of Mr. Cervine's vehicle. In determining reasonable suspicion, however, we must also "look to the knowledge of all the police involved in this criminal investigation, since probable cause can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest." *United States v.*

*Merritt*, 695 F.2d 1263, 1268 (10th Cir. 1982), *cert. denied*, 461 U.S. 916 (1983) (internal quotations omitted); *see also United States v. Swingler*, 758 F.2d 477 (10th Cir. 1985) (finding probable cause for automobile searches and the arrest of their occupants based on knowledge possessed by FBI agents, not the arresting state officers, that the defendants were transporting amphetamines). [7]

Although *Merritt* and *Swingler* apply the collective knowledge doctrine to only an investigative stop and an arrest, respectively, the reasoning of these cases, as well as rulings from outside this circuit, support application of this doctrine to justify a continued detention. *See United States v. Celio*, 945 F.2d 180 (7th Cir. 1991) (allowing a traffic stop, vehicle search, and protracted detention based on the collective knowledge).

Following the guidance of *Merritt* and *Swingler*, the district court found that the troopers had reasonable suspicion based both on the representations by DEA Agent Robert Ryan that Mr. Cervine was likely transporting illegal narcotics and on the facts supporting this assertion. *See Cervine*, 169 F. Supp. 2d at

---

[7]Although we can find no opinion that applies the collective knowledge doctrine to justify a search when the stop was based on an unrelated traffic violation, we see no reason that the policies underlying the collective knowledge doctrine would not support such a use. *Cf. United States v. Shareef*, 100 F.3d 1491, 1503-04 (10th Cir. 1996) (utilizing collective knowledge analysis, though refusing to impute collective knowledge on the arresting officer for other reasons, where a traffic violation formed the basis of the initial stop, but reasonable suspicion of criminal activity formed the basis of the vehicle search and occupant detention).

1213-14. According to the district court, Agent Ryan reasonably reached this conclusion based on his knowledge of the following facts at the time of the traffic stop:

(1) Timothy Cline was a primary supplier of pseudoephedrine to the primary methamphetamine manufacturer in the state of Kansas and received methamphetamine and other drugs in return for redistribution and use; (2) Cline was a member and former president of the Quapaw, Oklahoma chapter of The Loners motorcycle club and Cervine was the president of The Loners motorcycle club in Kentucky; (3) outlaw motorcycle groups were known to be associated with the drug business; (4) Cervine had been arrested in 1976 for possession of a controlled substance, possession of a hand grenade and possession of a firearm; (5) Cline and Cervine had recently been seen talking with each other at the national officers' meeting of The Loners motorcycle club in Las Vegas, Nevada; (6) authorized wiretaps of Cline's residential telephone on March 7, 2000 and March 11, 2000 revealed that Cline and Cervine were friends or close associates, that Cline called Cervine "Chief," and Cervine called Cline "Pony," that Cervine was planning to come to Kansas or Oklahoma and to bring his motorcycle to Cline's shop for repairs; (7) Rudolph James Maio, another friend or associate of Cline's, had been stopped in Oklahoma on February 22, 2000, after leaving Cline's motorcycle shop; Troopers found approximately $34,000, some of which was wrapped in a heat-sealed bag, in the saddlebags of the motorcycle Maio was hauling, and immediately detected the odor of marijuana upon opening that wrapper; (8) Cervine drove from Kentucky to Kansas, stayed approximately five hours at Cline's shop, then returned to his vehicle and drove toward Kentucky; (9) Cervine pulled off the interstate at least twice into a rest stop or exit and drove around very slowly but did not stop. *Id.*

Mr. Cervine does not dispute these facts.[8]  Given these facts and the

---

[8]Mr. Cervine claims that he actually stopped at the rest stops.  The district court, however, accepted the contrary testimony of Agent Ryan.  We accept the

(continued...)

-13-

experience of DEA Agent Ryan, the troopers possessed reasonable, articulable suspicion of criminal activity sufficient to justify detaining Mr. Cervine for 30-50 minutes.

That these facts could also reflect innocent conduct, as Mr. Cervine alleges, is of no consequence. "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277. Thus, reasonable suspicion exists even though the facts at hand could evidence a legitimate transaction.

Finally, the length of Mr. Cervine's detention did not violate the Fourth Amendment. Based on the troopers' testimonies and the dispatch log records, the district court concluded that the traffic stop, detention, and canine search of Mr. Cervine's vehicle lasted approximately fifty minutes. *Cervine*, 169 F. Supp. 2d at 1214-15. We have upheld similar waiting periods as satisfying the Fourth Amendment. *See, e.g., United States v. Villa-Chaparro*, 115 F.3d 797, 802-03 (10th Cir. 1997), *cert. denied*, 522 U.S. 926 (1997) (holding that the arresting officer "acted reasonably in detaining Defendant for five minutes from the time he stopped Defendant . . . and for an additional thirty-eight minutes while he waited for the canine unit to arrive.").

---

[8](...continued)
district court's factual finding on this score. *Flores*, 48 F.3d at 468.

-14-

III. Conclusion

Considering the totality of the circumstances, we AFFIRM the district court's denial of Cervine's motion to suppress.