**UNITED STATES of America, Plaintiff,**

v.

**Jason BROWN a/k/a Hector Burgos, Defendant.**

**No. 03–40094–JAR.**

United States District Court, D. Kansas.

April 2, 2004.

Randy M. Hendershot, Office of United States Attorney, Topeka, KS, for Plaintiff.

Michael S. Holland, Holland & Holland, Russell, KS, for Defendant.

### MEMORANDUM AND ORDER DENYING MOTION TO SUPPRESS

ROBINSON, District Judge.

On March 1, 2004, the Court held a hearing on defendant's motion to suppress all evidence seized from the search of a hidden compartment in defendant's rental car. Having reviewed the evidence and arguments presented by the parties, the Court is now prepared to rule.

## Facts

On August 31, 2003, Nicholas Hoffman, clerk at the North Comfort Inn in Hays, Kansas encountered defendant. Hoffman proceeded to check defendant into the hotel; he charged defendant's credit card successfully and gave defendant a room registration form. The registration form asked for a vehicle license plate number and/or vehicle description of the hotel occupant. Defendant, who was driving a rented Dodge Intrepid, inquired about the reason for the vehicle information on the form and Hoffman explained that the hotel's safety policy required that guests' vehicle information be faxed to the police department for safekeeping. At this point, Hoffman testified defendant began acting strangely, and protested that he would not get a room if the information was going to be given to the police. After Hoffman began to enter defendant's information into the computer, defendant asked that the information be deleted. Hoffman replied that he could not override the computer and defendant snatched the credit card receipt from Hoffman's hand and left. Thinking that defendant's actions were "suspicious," Hoffman phoned the police. While Hoffman was on the phone with the police, defendant returned and stated, "[i]f you are on the phone with the police, I'm going to kick your ass." Hoffman watched as defendant then drove away quickly, through a red light and toward Interstate 70. Hoffman, who was still on the phone, reported this to the police.

Russell County Sheriff's Deputies Dollison and Houck learned of defendant's activity at the motel from dispatch. Dollison considered defendant's activity at the motel indicative of a wanted person, a stolen vehicle, narcotics, or many other things, particularly because the Interstate 70 corridor is a "high crime area." When Dollison located a Dodge Intrepid matching the description of defendant's vehicle on Interstate 70, he pulled behind the car. The car was traveling slowly, only about 55–60 mph in a 70 mph speed limit. Over a two mile stretch of flat, straight road, Dollison witnessed the car swerve over the white right fog line three or more times. It was rainy with a north wind on August 31, but the rain was light and Dollison had no problems staying between the lines, no problems with his tires, and no problems with hydroplaning. Additionally, Dollison saw no indications that defendant was running into patches of water, nor any other factors explaining his repeated strays over the fog line, so Dollison stopped defendant, at 3:42 a.m.

Upon stopping the defendant, Dollison made several observations of defendant that made Dollison suspicious. First, defendant stated that he had been stopped by police two miles up the road. Dollison thought this curious because he had heard no radio traffic, nor had he seen any other police vehicle in the area.[1] Defendant told Dollison that he was in the floor cleaning business, but he was wearing a suit and tie. When Dollison asked defendant where he was coming from, he replied only "out west." Defendant was driving a rental car; and the rental contract showed the car was due on August 21, making the car ten days overdue. Houck tried to reach Enterprise to inquire about the overdue contract, but could not reach anyone at 3:49 a.m. Additionally, defendant was "overly talkative" and nervous; he told Dollison his father and sister were employees of the New York Port Authority and he showed Dollison a photo of his daughter.

---

1. Dollison later learned that defendant had been stopped by Sergeant Blain Dryden of the Hays Police Department, but Dollison did not know this when he stopped defendant because the radios were on different frequencies.

**1112**

Dollison testified that while nervousness during a traffic stop is not uncommon, defendant's nervousness persisted throughout the stop and did not abate as it does with most people. Furthermore, officers learned from dispatch that defendant was not Hector Burgos as he had told Dollison, but rather Jason Brown. And, Houck saw air fresheners on the floor board of the vehicle, which the officers testified are often used as masking agents when transporting narcotics. Finally, defendant told Dollison he was going to New York City, a known drug distribution city.

The initial traffic stop lasted only twelve minutes, until 3:54 a.m. Dollison returned defendant's paperwork and issued a warning citation. It was only after the warning citation was issued that defendant's nervousness lessened. Dollison told defendant to drive carefully; Dollison began to walk away, and then turned back and asked for consent to search, explaining that narcotics and illegal weapons are often transported on Interstate 70. Defendant replied "okay, I don't have no narcotics."

The vehicle search revealed air fresheners on the floor board, air freshener in the glove box, and more air fresheners in the trunk. Also in the trunk were two bottles of cleaning supplies, a hanging clothes bag, a shaving kit and a gas can. Dollison thought it unusual to have a gas can in a rented car, particularly because the gas can had a duct taped spout and an air freshener was laying directly on top of the gas can. The presence of the duct tape and the air freshener indicated to Dollison that defendant was trying to mask the odor of something. Additionally, Dollison testified that the presence of the gas can, and his experience in detecting modified gas tanks, made him suspicious of a hidden compartment in the gas tank, which would decrease the volume of gas that the tank could hold.

After the roadside search of the car, Dollison believed there was a hidden compartment in the vehicle, so at 4:02 a.m., he phoned officer Schneider at home and asked him to bring his drug dog to the scene. During the phone call, Dollison relayed the officers' observations of suspicious activity, including the prior incident at the hotel, and the expired rental contract. While waiting for Schneider, the officers visited with defendant about the weather, travel plans, jobs and spouses and Dollison told defendant that the drug dog was coming to sniff his car. Defendant remained friendly and continued to engage in small talk with the officers even after learning of the drug dog. At 4:25 a.m., Schneider phoned Dollison and explained that he would not be able to come because he had locked his keys in his trunk. Schneider suggested the officers ask defendant to go to the Sheriff's Office to sort out the overdue rental contract.

At 4:30 a.m., Dollison and Houck explained to defendant that they needed to go to the Sheriff's Office to check on the validity of the rental contract. Defendant agreed to go and followed the officers to the Sheriff's Office where his car was put in the garage. During the time defendant's car was in the garage, defendant stayed in the garage so he could smoke. Houck stayed with defendant in the garage and made small talk, while Dollison attempted to call Enterprise. While examining the rental contract at the Sheriff's Office, Dollison noticed that some states were typed on the rental contract, but others, including Indiana, Missouri, Illinois, Kansas, Colorado, Ohio, Kentucky, Virginia, West Virginia, New Jersey and New York were handwritten on the contract, which Dollison considered unusual. Dollison was able to reach Enterprise from the Sheriff's Office and confirm that defendant had permission to extend the contract.

Houck and defendant walked from the garage to Dollison's office to see whether Dollison had reached Enterprise. As they were waiting for Dollison, Houck and defendant looked at photos on the wall of hidden compartments and drug seizures. After seeing the photos, defendant became extremely nervous and agitated and began pacing in the hallway. Schneider arrived at Dollison's office at this time[2] and he and Houck went back to the garage to examine the vehicle, while defendant waited for Dollison. Dollison informed defendant that Enterprise said the contract was valid and returned the contract. Then, Dollison asked defendant if they could continue to search his vehicle, and defendant said yes.

Schneider and Houck examined defendant's car and saw tool marks on the bolts for the gas tank and noticed the hose clamps on the gas tank were rusty and did not appear to be factory installed. The officers believed the gas tank had been removed and found this suspicious because the car had only been driven for 16,000 miles. At this point, Schneider testified that he was 90–95% sure something was in the gas tank and believed he had probable cause to search. Houck returned to Dollison's office and witnessed defendant give permission for the officers to search his vehicle. This was the second time defendant had given consent to search; defendant previously gave Dollison permission to search his vehicle at the roadside. At no time, at the scene, or at the garage, did defendant revoke his consent to search.

Schneider then removed the gas tank and found a large amount of pink Bondo inside. Bondo is a substance used by auto body shops to patch and fill metal, and is often used to seal compartments. Beneath the Bondo was cardboard and beneath the cardboard were six packages of what was later determined to be cocaine. At 6:30 a.m. Defendant was arrested.

### Analysis

" 'A traffic stop is a "seizure" within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention quite brief.' "[3] The principles of *Terry v. Ohio*[4] apply to such traffic stops. Thus, the reasonableness of a stop depends on "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."[5]

### 1. The Validity of the Initial Stop

▮ Tenth Circuit cases establish that "a detaining officer must have an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring before stopping [an] automobile."[6] Here, Dollison testified that he learned of the hotel incident from police dispatch, and received a description of the vehicle seen racing away from the hotel and toward Interstate–70. While on the lookout for the vehicle, Dollison saw a dark colored Dodge Intrepid which matched the description he received from dispatch. Dollison stated that he saw the vehicle

---

**2.** Schneider did not have his drug dog with him because he came to the Sheriff's Office in his personal car; the keys to his patrol car were still locked in the trunk.

**3.** *United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir.2001) (en banc) (quoting *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir.1998) (further quotation omitted)).

**4.** 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**5.** *Id.* at 19–20, 88 S.Ct. 1868.

**6.** *United States v. Cervine*, 347 F.3d 865, 869 (10th Cir.2003); *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir.1993).

cross over the white right fog line three or more times. Hence, Dollison testified that he stopped defendant on two grounds: based on the report from dispatch concerning the hotel incident and for a violation of K.S.A. 8–1522. The statute provides:

> Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic, the following rules ... shall apply: a) A vehicle shall be driven as nearly as practical entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.

Defendant claims the purpose of K.S.A. 8–1522 is to prohibit unsafe lane changes, "not an occasional drift onto the shoulder of the road." Consequently, defendant contends, no violation of the statute occurred and officers lacked probable cause and reasonable suspicion to stop defendant.[7] Defendant does not address his earlier actions at the hotel, nor whether those actions coupled with his crossing the fog line provided officers with reasonable suspicion.

■ Defendant propounds that K.S.A. 8–1522 is only applicable to changes from one traffic lane to another, but offers no authority to support this thesis. Contrary to defendant's claims, K.S.A. 8–1522 is intended to deal with drifts onto the shoulder of the road. The plain language of the statute requires that a vehicle remain "as nearly as practical entirely within a single lane."[8] Moreover, settled case law confirms that K.S.A. 8–1522 is intended to deal with detours over the fog line.[9]

■ While the statute is clearly intended to deal with drifts onto the shoulder, merely crossing the fog line does not automatically give officers reasonable suspicion that a violation of K.S.A. 8–1522 has occurred.[10] Rather, the use of the phrase "as nearly as practical" in the statute precludes absolute standards and demands a fact specific inquiry to assess whether an officer has reasonable suspicion to believe a violation has occurred.[11] *United States v. Gregory,*[12] which the defendant relies heavily upon, demonstrates the need to analyze objectively all the surrounding facts and circumstances to determine whether the officers had reasonable suspicion. In *Gregory,* the defendant's truck briefly crossed the fog line in winding, mountainous terrain on a windy day.[13] The court held that *"under these conditions any vehicle could be subject to an*

---

7. Defendant refers to both reasonable suspicion and probable cause in his brief. However, Tenth Circuit case law makes clear that "while either probable cause or reasonable suspicion is sufficient to justify a traffic stop, only the lesser requirement of reasonable suspicion is necessary." *Cervine,* 347 F.3d at 869 n. 2. Thus, the relevant inquiry is whether the officers had reasonable suspicion to stop defendant. *Id.*

8. K.S.A. 8–1522.

9. *See United States v. Ozbirn,* 189 F.3d 1194, 1198–99 (10th Cir.1999) (crossing over the fog line twice in optimal weather conditions violates K.S.A. 8–1522); *United States v. Cline,* 349 F.3d 1276, 1287 (10th Cir.2003) (swerving once onto the shoulder was a violation of K.S.A. 8–1522, when defendant nearly struck a bridge abutment); *United States v. Hernandez,* 944 F.Supp. 847, 850–51 (D.Kan. 1996) (crossing fog line twice is a violation of the K.S.A. 8–1522); *United States v. Parada,* 289 F.Supp.2d 1291, 1300 (D.Kan.2003) ("Officer Oehm testified that he observed the driver of the van cross the 'fog line' of the highway twice, then drive on the line." This is sufficient to believe that the driver was violating K.S.A. 8–1522, which requires that a vehicle be "driven as nearly as practicable entirely within a single lane.")

10. *Ozbirn,* 189 F.3d at 1198;

11. *Id.; Cline,* 349 F.3d at 1286.

12. 79 F.3d 973 (10th Cir.1996).

13. *Id.* at 978.

isolated incident of moving into the right shoulder of the roadway without giving rise to a suspicion of criminal activity." [14] Thus, like the court in *Gregory*, this Court must engage in fact-specific analysis to determine whether the officers had reasonable suspicion to stop defendant for violating K.S.A. 8–1522.[15]

■ The Court concludes that under the facts and circumstances of this case, Dollison and Houck had reasonable suspicion to stop defendant for an observed violation of K.S.A. 8–1522. The officers saw defendant's vehicle drift onto the shoulder, not once, but three or more times, over a two-mile stretch. Defendant stresses that the rain contributed to his crossing the fog line and contends that he stayed as "nearly as practical" within the lane under the weather conditions. Although defendant emphasizes the rain, the video shows the rain to be only a mist and the windshield wipers on the patrol car were set at an intermittent level, further indicating light, rather than heavy rain. Moreover, Dollison testified that he had no problems with his tires, and no problems hydroplaning and saw no indications that defendant was running into patches of water, nor any other factors explaining his repeated strays over

the fog line. Defendant also contends that the weather was "extremely windy with sporadic high gusts of wind," but Dollison stated that he had no problems staying between the lines. Furthermore, the stretch of Interstate–70 on which defendant was traveling was flat and straight, not mountainous and winding as in *Gregory*. Finally, the officers did nothing to cause the vehicle to veer onto the shoulder, such as pulling up next to the vehicle.[16] An objective analysis of all the surrounding facts and circumstances thus suggests that the officers had reasonable suspicion to stop defendant for a violation of K.S.A. 8–1522.[17]

### 2. Validity of the Roadside Search and Detention

■ Even if the initial stop of defendant's vehicle was legitimate, the detention must be "reasonably related in scope to the circumstances which justified the interference in the first place," as required under *Terry*.[18] "Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop." [19] The detention must be temporary and its scope must be carefully and narrowly tailored to its underlying justification.[20] "Under ordinary circumstances,

14. *Id.*

15. *See Ozbirn*, 189 F.3d at 1198; *Cline*, 349 F.3d at 1286–87; *Hernandez*, 944 F.Supp. at 850–51 (discussing the weather and road conditions to determine whether a violation of K.S.A. 8–1522 occurred).

16. *See United States v. Ochoa*, 4 F.Supp.2d 1007, 1012 n. 4 (D.Kan.1998) (finding a single crossing onto the shoulder is not a violation of K.S.A. 8–1522 where the officers either caused or contributed to the vehicle veering outside the lane).

17. And defendant's earlier actions at the hotel certainly contributed to the officers' reasonable suspicion. *See United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir.2003) ("Specifical-

ly, police observation of an individual, fitting a police dispatch description of a person involved in a disturbance, near in time and geographic location to the disturbance establishes a reasonable suspicion that the individual is the subject of the dispatch.")

18. *United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir.2001); *United States v. Bustillos–Munoz*, 235 F.3d 505, 512 (10th Cir. 2000).

19. *Cervine*, 347 F.3d at 870–71 (internal quotation omitted); *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir.1999).

20. *United States v. Gutierrez–Daniez*, 131 F.3d 939, 942 (10th Cir.1997), *cert. denied* 523 U.S. 1035, 118 S.Ct. 1334, 140 L.Ed.2d 494

this limits the officer to a request for the driver's license and registration, a computer check on the car and driver, an inquiry about the driver's travel plans, and the issuance of a citation."[21] Upon issuing the citation or warning and determining the validity of the driver's license and right to operate the vehicle, the officer usually must allow the driver to proceed without further delay or additional questioning.[22]

 A longer detention for additional questioning is permissible under two circumstances: (1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring; or (2) the initial detention changes to a consensual encounter.[23] If the officer continues to question the driver in the absence of either of these two circumstances, then "any evidence derived from that questioning (or a resulting search) is impermissibly tainted in Fourth Amendment terms."[24] But, if an encounter between a police officer and a motorist is consensual, the Fourth Amendment ban on unreasonable searches and seizures does not come into play.[25]

 Defendant contends that his Constitutional rights were violated when officers continued to detain him without reasonable suspicion after the purpose of the initial stop had been accomplished. However, a longer detention is permissible if an officer has reasonable suspicion, *or* if the initial detention changes to a consensual encounter.[26] Here, the roadside detention was clearly consensual.

 "In determining whether a driver and police officer are engaged in a consensual encounter in the context of a traffic stop, there are few, if any, bright-line rules."[27] Rather, the court must consider "the totality of the circumstances in a particular case."[28] While the return of documents, such as a driver's license or other personal papers, is a prerequisite to an encounter becoming consensual, it "is not always sufficient to demonstrate that an encounter becomes consensual."[29] Accordingly, even after the officer returns a driver's papers, the encounter may not be consensual where "there was evidence of a 'coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled.'"[30] The Tenth Circuit has observed in dicta that an officer leaning on a car may support a finding of a coercive show of authority.[31] However, the ultimate test is whether "a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information."[32]

(1998); *United States v. Lindsey,* 288 F.Supp.2d 1196, 1202 (D.Kan.2003).

**21.** *Cervine,* 347 F.3d at 871.

**22.** *United States v. Zubia–Melendez,* 263 F.3d 1155, 1161 (10th Cir.2001); *Patten,* 183 F.3d at 1193.

**23.** *Cervine,* 347 F.3d at 871.

**24.** *United States v. Elliott,* 107 F.3d 810, 813 (10th Cir.1997) (internal quotations and citations omitted).

**25.** *See United States v. Walker,* 933 F.2d 812, 816–17 (10th Cir.1991) *cert. denied,* 502 U.S. 1093, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992).

**26.** *Cervine,* 347 F.3d at 871.

**27.** *United States v. Elliott,* 107 F.3d at 813.

**28.** *Id.* at 814 (citing *Ohio v. Robinette,* 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996)).

**29.** *Elliott,* 107 F.3d at 814; *United States v. Gregory,* 79 F.3d 973, 979 (10th Cir.1996).

**30.** *Elliott,* 107 F.3d at 814.

**31.** *Id.*

**32.** *United States v. McKneely,* 6 F.3d 1447, 1451 (10th Cir.1993); *See also United States v. Anderson,* 114 F.3d 1059, 1064 (10th Cir.

In this case, Dollison returned defendant's paperwork and issued a warning citation. Dollison then told defendant to drive carefully and he began to walk away. There is no evidence of a coercive show of authority, such as the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled. And, it was only after Dollison turned and began to walk away that he turned back and asked for consent to search because drugs are often transported on Interstate 70. To this question, defendant replied "okay, I don't have no narcotics," rendering the roadside search consensual. The tape reveals that the defendant never revoked his consent, even after defendant was informed that a drug dog was on the way. In fact he and Dollison engaged in pleasant small talk about the weather, travel plans, jobs and spouses throughout the detention. There is simply no evidence of a coercive show of authority by officer Dollison.

 Even assuming *arguendo* the roadside detention was non-consensual, the officers had a reasonable and articulable suspicion of criminal activity making the extended detention lawful.[33] After stopping defendant, and the consensual search of defendant's car, the officers made the following observations, which added to their knowledge concerning defendant's earlier bizarre actions at the hotel and his erratic driving:

— Defendant was extremely nervous with shaky hands and this nervousness did not abate;

— Defendant was overly talkative, sharing details of his family life with Dollison, including showing Dollison a picture of his daughter;

— Defendant told officers he was Hector Burgos, but officers learned from dispatch that defendant was really Jason Brown;

— Defendant was heading toward New York City, a known drug distribution city;

— Defendant told officers he was in the floor cleaning business, but was driving in a suit and tie at 3:45 a.m.;

— Defendant told Dollison he had just been stopped by other officers, but Dollison did not see another patrol car or hear the other officers on the radio;

— Defendant possessed air fresheners on the floorboard of his vehicle, in his glove box and in his trunk;

— Defendant's trunk contained a gas can with a duct taped spout and an air freshener was laying directly on top of the gas can; and

-The rental agreement had been expired for ten days.

The observations of the officers, taken together, gave the officers a "particularized and objective basis for suspecting legal wrongdoing."[34] Dollison and Houck drew "on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."[35] The Court concludes that the officers' cumulative observations caused them to have a reasonable suspicion of criminal activity that justified a prolonged investigative detention.

1997) (noting that an officer need not tell the driver he is free to leave for the encounter to be consensual).

33. *See United States v. Turner*, 928 F.2d 956, 959 (10th Cir.1991) (holding that specific, articulate facts that form a reasonable suspicion

of criminal activity make a prolonged *Terry* stop lawful).

34. *See United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

35. *See id.* at 273–74, 122 S.Ct. 744.

### 3. Reasonableness of the Delay from the Drug Dog

 Defendant argues the roadside delay while the officers waited for Schneider to bring the drug dog was unreasonable. But, because the officers had reasonable suspicion of criminal activity, the prolonged investigative detention was lawful. Moreover, the delay attributable to waiting for the drug dog was short; defendant was stopped at 3:42 a.m. and the first twelve minutes of the stop were related to the traffic infraction. Seven minutes were then spent by the officers getting consent to search the vehicle and conducting the search. The next twenty-eight minutes were spent waiting for the drug dog. Twenty-eight minutes is clearly a reasonable delay, under the circumstances of this case.[36] Schneider testified that he received the call in the middle of the night, and had to wake up and get dressed before coming to the scene. The fact that Schneider never arrived on the scene with the drug dog due to vehicle problems does not alter the analysis. Thus, the Court concludes that, neither the twenty-eight minute delay from the drug dog, nor the total fifty-six minute detention on the roadside were unreasonable or unjustifiable in light of the facts as they unfolded during the early morning hours of August 31, 2003.

### 4. Validity of the Trip to the Russell County Sheriff's Office

 Defendant argues that because the officers did not have probable cause to arrest him, he was illegally seized and suffered a de facto arrest when officers ordered him to go the Sheriff's Office. The government counters that the trip to the Sheriff's Office was consensual and that defendant was merely confident in his camouflaged compartment.

Although defendant claims he was *ordered* to go the Sheriff's Office, the videotape and the officers' testimony demonstrate that the trip was a consensual encounter. Dollison asked defendant to *follow* the officers to the Sheriff's Office, but at first defendant did not understand. Houck then explained to defendant that the officers needed him to *follow* them to the Sheriff's Office to check on the validity of the rental contract, and defendant, just as he had earlier agreed to allow Dollison to search his vehicle, agreed to follow the officers. Houck testified that he intervened not because defendant was balking, but because defendant did not understand Dollison's request. The videotape corroborates Houck's testimony; after the officers reentered their patrol car and began driving toward the Sheriff's Office, Houck apologized to Dollison, stating that he did not intend to step on Dollison's toes, but that defendant just did not understand Dollison's request. Additionally, the videotape shows that the officers' tones were friendly and conversational, not coercive. No physical touching or brandishing of weapons ever occurred. Moreover, the consensual encounter did not become non-consensual because the officers

---

**36.** *See United States v. Villa–Chaparro,* 115 F.3d 797, 802–03 (10th Cir.1997), *cert. denied,* 522 U.S. 926, 118 S.Ct. 326, 139 L.Ed.2d 252 (1997) (extended detention of almost forty minutes spent waiting for a drug-sniffing dog did not violate the Fourth Amendment); *United States v. Garcia,* 52 F.Supp.2d 1239 (D.Kan.1999) (finding a delay of 40 minutes not unreasonable where supported by reasonable suspicion, even where the driver was being detained against his will); *United States v. Alpert,* 816 F.2d 958 (4th Cir.1987) (upholding 50 minute detention); *United States v. Hardy,* 855 F.2d 753, 760 (11th Cir.1988) *cert. denied* 489 U.S. 1019, 109 S.Ct. 1137, 103 L.Ed.2d 198 (1989); *United States v. $64,765.00,* 786 F.Supp. 906, 912 (D.Or. 1991).

failed to inform defendant that he could proceed on his way; it is well-settled that an officer need not inform a suspect that he is free to leave.[37]

Defendant's reliance on *United States v. Recalde*[38] for the principle that he was illegally seized when officers requested he follow them to the Sheriff's Office, is misplaced. In *Recalde*, the officer retained the defendant's license and vehicle registration at the time the officer requested the defendant to follow him to the police station.[39] The defendant was not free to proceed without his license and registration so the court concluded that the officer's request that the defendant follow him to the police station could not be consensual.[40] In the present case, however, Dollison had returned defendant's license and registration before he asked defendant to follow him to the station, and there is no other indicia of coerciveness.

### 5. Validity of the Vehicle Search at the Sheriff's Office

Defendant argues that he did not voluntarily, knowingly and willfully consent to the search of his vehicle at the Sheriff's Office because the officers did not have probable cause to compel him to go to the Sheriff's Office in the first instance. But, as discussed above, whether the officers had probable cause is inapposite because the trip to the Sheriff's Office was a consensual encounter. Defendant agreed to follow the officers and then voluntarily followed the officers to the Sheriff's Office.

■ Moreover, defendant consented to the search of his vehicle at the Sheriff's Office. Dollison testified that after he contacted Enterprise and confirmed the validity of the rental agreement, he informed defendant of this fact. And, after informing defendant that the rental agreement was valid, Dollison testified that he asked defendant for permission to search defendant's car and defendant agreed. Houck testified that he witnessed Dollison asking for and defendant giving consent to search. This was the second time defendant had given consent to search his vehicle; he previously consented to a roadside search of his car. Although not on tape, Dollison and Houck testified that defendant never revoked his consent to search. The officers stated that there was no coercion at the Sheriff's Office. Defendant was allowed to move freely about at the Sheriff's Office and at no time was he handcuffed or restrained in any way.

The consensual search of defendant's vehicle first yielded evidence raising reasonable suspicion that the fuel tank had been removed, even though the car had only been driven 16,000 miles. The officers noticed tool marks on the bolts on the gas tank and the hose clamps on the tank were rusty; the tank did not appear to be factory installed. Pursuant to defendant's consent to search, the officers then removed the tank and found the hidden compartment, containing what appeared to be cocaine. At this point, the officers had probable cause to believe that defendant had committed an offense and properly arrested defendant and seized the evidence.[41]

---

37. *United States v. West*, 219 F.3d 1171, 1176–77 (10th Cir.2000).

38. *United States v. Recalde*, 761 F.2d 1448 (10th Cir.1985).

39. *Id.* at 1453–54.

40. *Id.*

41. *See, e.g., United States v. Anderson*, 114 F.3d 1059, 1066 (10th Cir.1997) (evidence of hidden compartment uncovered by an officer during a consensual search of vehicle following routine traffic stop, coupled with conflicting answers given by the driver and passenger as to their destination and the heavy scent of air freshener in the vehicle, gave the officer probable cause to search gas tank itself).

Because defendant was legally stopped, the prolonged investigative roadside detention was either consensual or justified by reasonable suspicion. The delay from the drug dog was reasonable. The trip to the Sheriff's office and subsequent search were consensual. The officers first found evidence that the gas tank had been removed. Still operating with the defendant's consent, they removed the gas tank, and found what appeared to be packages of cocaine in the tank. Thus, the officers had probable cause to seize the cocaine.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion to suppress evidence is denied.

**IT IS SO ORDERED.**