**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 21 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

TIMOTHY JAY CLINE, a/k/a Pony,

Defendant - Appellant.

No. 02-3418

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 00-CR-40024-03-SAC)**

Daniel E. Monnat, Monnat & Spurrier, Chtd., Wichita, Kansas, for Defendant-Appellant.

Anthony W. Mattivi, Assistant United States Attorney (Eric F. Melgren, United States Attorney, with him on the brief), Topeka, Kansas, for Plaintiff-Appellee.

Before **SEYMOUR** , Circuit Judge, and **ANDERSON** and **BRORBY** , Senior Circuit Judges.

**ANDERSON** , Circuit Judge.

Timothy J. Cline was convicted following a seven week jury trial on the following counts: conspiracy to manufacture more than one kilogram of methamphetamine, in violation of 21 U.S.C. § 846 (count 1); three counts of distribution of varying amounts of pseudoephedrine, in violation of 21 U.S.C. § 841(d)(2) (counts 2, 3, and 4); distribution of approximately two kilograms of pseudoephedrine, in violation of 21 U.S.C. § 841(d)(2) (count 5); two counts of knowingly and intentionally using, or causing to be used, a communication facility or communication facilities in facilitating a drug trafficking offense, in violation of 21 U.S.C. § 843(b) (counts 7 and 8); three counts of distribution of varying amounts of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (counts 12, 13 and 14); and two counts of possession with intent to distribute varying amounts of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (counts 15 and 23). He was sentenced to 360 months imprisonment and five years of supervised release, and directed to pay a $1200 assessment.

Cline's motions to suppress evidence, seized pursuant to a series of wiretaps, during a traffic stop, and during a search of his house, were denied. Additionally, his motion for judgment of acquittal or, in the alternative, for a new trial was denied. He appeals the denial of those motions. We affirm.

# BACKGROUND

Federal law enforcement authorities first became interested in Cline in 1994 when agents from the Internal Revenue Service and the Drug Enforcement Agency ("DEA") noticed that Cline and his wife, Janet Cline, had made an unexplained expenditure of some $500,000 in cash. While investigating this matter, agents executed a search warrant of the Clines' house but found nothing incriminating. No criminal charges were ever filed.

Federal authorities briefly investigated Cline again in 1997 after arresting Anthony Fracasso, who admitted to producing methamphetamine, but again were unable to develop sufficient evidence to file charges against Cline. In 1998 and 1999, agents from the DEA and the Kansas Bureau of Investigation began an investigation into a large drug trafficking organization in the tri-state area of southeast Kansas, southwest Missouri and northeast Oklahoma. One focus of the investigation was a motorcycle store, Biker's Dream, owned and operated by Cline. Agents suspected that Biker's Dream was the source of large quantities of pseudoephedrine, a precursor chemical for the production of methamphetamine. They further suspected that Shane Wright was a methamphetamine cook and dealer and that Wright and Cline were associated in a methamphetamine

production and distribution ring. [1] Facts generally outlining the course of the investigation are set out below, with greater detail supplied in connection with the discussion of specific issues.

Investigators used court-authorized wiretaps as part of their investigation into the Wright-Cline methamphetamine organization. Accordingly, they monitored five separate telephone lines, including the business telephone line for Biker's Dream and the residential telephone line of Cline and his wife, as well as Wright and others. Further details regarding the information presented in the affidavits submitted in support of the applications for the wiretaps will be discussed in connection with Cline's arguments about the wiretaps.

Another tactic the agents investigating the Wright-Cline methamphetamine organization used was to conduct traffic stops based in part upon information gleaned from the wiretaps. One such stop involved Cline, in which, based on information obtained in a wiretapped phone conversation, a DEA agent and a state trooper followed Cline's truck for several miles on a windy day, at which time they observed his truck swerve once onto the shoulder of the road, nearly hitting a bridge railing. They subsequently pulled his truck over for the observed traffic violation and, after obtaining consent to search it, discovered some 16,000

[1]Much of the evidence against Cline at his trial came from Wright and his wife, Tracy, who pleaded guilty to conspiracy to manufacture and distribute methamphetamine and testified against Cline.

-4-

pseudoephedrine tablets. Further factual details concerning the stop will be discussed in connection with Cline's argument about the validity of the traffic stop and the subsequent seizure of the pills.

Subsequently, on March 27, 2000, agents executed a search warrant at Cline's home, during which they found numerous firearms around the house, some loaded, and some small amounts of drugs. Cline was arrested at that time. Further factual details concerning the execution of the warrant will be discussed in connection with Cline's arguments about the validity of the execution of the warrant.

Prior to trial, Cline's counsel filed a motion *in limine* seeking to prevent the government from presenting, inter alia, any evidence regarding Cline and his wife's pending divorce and Cline's young girlfriend. When the government informed the court that it did not intend to offer any such evidence, the court denied the motion as moot. The court added, "Nor shall the government otherwise refer to or mention this evidence before the jury panel or jury without first approaching the bench." R. Vol. 8, tab 1310 at 19. At trial, the government questioned a witness regarding Cline's girlfriend and elicited testimony about her age without first obtaining the court's approval. The court overruled Cline's objection to that testimony. Following the jury's guilty verdict, Cline filed a motion for acquittal or, alternatively, for a new trial, contending that the

government's violation of the *in limine* order was prosecutorial misconduct warranting a new trial. Further details about the circumstances surrounding this incident will be discussed in connection with Cline's argument about this issue.

Cline argues (1) the district court erred in refusing to suppress evidence improperly obtained through the use of wiretaps because (a) the wiretaps were obtained without an adequate showing of necessity and (b) the government failed to timely seal the tapes of the calls intercepted on Cline's home telephone; (2) the district court erred in refusing to suppress evidence obtained following the allegedly unlawful traffic stop of Cline because (a) when Cline was pulled over for drifting once onto the shoulder on a windy day after being followed for several miles by a trooper, the stop was not justified at its inception; (b) the detention, while officers discussed how to proceed with their drug investigation, exceeded the permissible scope of the traffic stop; and (c) Cline's consent to search, given immediately following the unlawful stop and detention, was tainted and therefore not voluntary; (3) the district court erred in refusing to suppress evidence seized following the execution of the search warrant at Cline's home when officers broke down the door without giving the Clines sufficient time to admit the officers; and (4) the government committed misconduct by presenting testimony about Cline's girlfriend in violation of the court's *in limine* order and

the court erred in overruling Cline's objection to the evidence and in denying his motion for a new trial.

**DISCUSSION**

**I. Suppression of Evidence Obtained Through Wiretaps**

    **A. Adequacy of Showing of Necessity**

Cline argues first that the wiretaps on the phones at his business and his home and on Wright's home were obtained without an adequate showing of necessity. The district court denied his motion to suppress evidence obtained by means of those wiretaps, concluding that the government had adequately demonstrated necessity. "We review for an abuse of discretion a district court's determination that a wiretap was necessary." United States v. Ramirez-Encarnacion, 291 F.3d 1219, 1222 (10th Cir. 2002). Further, "[a] defendant bears the burden of proving that a wiretap is invalid once it has been authorized." Id. If a defendant succeeds in showing that the necessity requirement was not met, evidence seized pursuant to the wiretap must be suppressed. Id.

By statute, an application for a wiretap order must contain a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The authorizing judge must

similarly find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous" in order to meet the necessity requirement. 18 U.S.C. § 2518(3)(c); see also Ramirez-Encarnacion, 291 F.3d at 1222.

Such traditional investigative techniques include "(1) standard visual and aural surveillance; (2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); (3) use of search warrants; and (4) infiltration of conspiratorial groups by undercover agents or informants." United States v. VanMeter, 278 F.3d 1156, 1163-64 (10th Cir. 2002) (quoting United States v. Castillo-Garcia, 117 F.3d 1179, 1187 (10th Cir. 1997), overruled on other grounds by United States v. Ramirez-Encarnacion, 291 F.3d 1219 (10th Cir. 2002) (en banc n.1)). Other traditional techniques include pen registers and trap and trace devices. See Ramirez-Encarnacion, 291 F.3d at 1222 n.2.

If it has not tried those traditional techniques, the government must explain that failure with particularity. Id. at 1222; see also United States v. Mitchell, 274 F.3d 1307, 1310 (10th Cir. 2001). "[G]eneralities, or statements in the conclusory language of the statute, are insufficient to support a wiretap application. The statements must be factual in nature and they must specifically relate to the individuals targeted by the wiretap." Castillo-Garcia, 117 F.3d at 1188.

However, we "consider all the facts and circumstances . . . and read the necessity requirement in a common sense fashion." Ramirez-Encarnacion, 291 F.3d at 1222 (internal quotations and citations omitted).

Cline argues that the language in the applications for the wiretaps on the phones in his home and his business as well as in the Wright home were conclusory and failed to adequately demonstrate necessity as to him. He asserts that "[t]he facts set forth in the applications and affidavits showed either that the normal investigative techniques that were undertaken were effective or that they had not been tried prior to seeking the wiretaps." Appellant's Br. at 11.

Eight applications were filed in this case, seeking authorization to intercept wire communications on five separate telephone lines.[2] Cline argues he was one of the individuals targeted by the wiretaps on the Wright residence telephone (Line A), the Biker's Dream phone (Line D) and his own home telephone (Line E). Senior Judge Richard Rogers of the United States District Court for the District of Kansas signed the orders authorizing and extending the interception of the wire communications on four of the five lines (Lines A-D), and Judge Sven

_____

[2]There were three applications for three monitoring periods on the Wrights' house (Line A), one application for a cell phone registered to Miste Alartosky (Line B), two applications for cell phones registered to Johnny Wright (Line C), one application for the business telephone at Biker's Dream (Line D) and one application for the Clines' home telephone (Line E).

Holmes of the United States District Court for the Northern District of Oklahoma signed the order authorizing the interception of the fifth line (Line E).

The Wright wiretap was obtained first. Cline argues that the affidavit of DEA agent Robert Ryan in support of the original application for the Wright wiretap only cursorily recites prior efforts to infiltrate the organization and the use of ordinary investigative techniques like telephone records, pen registers, background checks, general questioning, informants, physical surveillance, and search warrants, and only mentions Cline by name once. See R. Vol. 83, doc. 628, tab 4. He argues that subsequent affidavits submitted in support of the government's applications for extensions of the wiretap on Wright's telephone, as well as the application for wiretaps on Cline's own residence and on the Biker's Dream, suffered from the same deficiencies. We disagree with all his arguments. Because all the challenged affidavits are very similar, we will address them collectively, pointing out, where necessary, any differences between them.

The affidavits in support of the applications recited the "use and exhaustion of normal investigative techniques," including "[i]nfiltration by undercover officers," "[r]eview of telephone records, including pen register results," "[r]eview of general background and police records of suspected traffickers," "[g]eneral questioning, with or without grants of immunity," "[u]se of informants," "[p]hysical surveillance," "[s]earch warrants," and "[w]ire

intercepts." R. Vol. 84, doc. 629, tab 7, ¶ 76 (Biker's Dream Wiretap App.), tab 8, ¶ 81 (Cline Residence Wiretap App.), R. Vol. 83, doc. 628, tab 4, ¶ 73 (Wright Residence Wiretap App.). The affidavits explained how infiltration by undercover agents had been unsuccessful because most members of the organization had lived in the same area for years, had known each other for years, and were suspicious of anyone new. Further, the affidavits stated that the investigation revealed that Wright kept his subordinates separate so that they did not always know each other's identity or know what other members of the organization were doing. The affidavits recited the investigation's limited success with the three cooperating individuals the agents had used thus far and that

> [t]o date, no successful undercover activity has been mounted directly with Tim CLINE. CLINE is very careful to protect himself from this type of activity by dealing only with trusted members of his organization. From training and experience, this affiant knows that members of organized 'outlaw' motorcycle gangs are very paranoid and protective o[f] their organizations and activities.

R. Vol. 84, doc. 629, tab 7, ¶ 80. [3]

The affidavits recounted the use of pen register information in the investigation, but stated that such information was limited in its usefulness because it did not reveal the identities of the parties to the conversation nor the

---

[3]Cline was a member and president of the Loners Motorcycle Gang.

nature or substance of the conversation, nor differentiate between legitimate calls and those for criminal purposes. For example, "pen register information has established that Tim CLINE utilizes the target telephones to make contact with other members of the LONERS MOTORCYCLE GANG, but the exact nature of the conversations cannot be known without the use of wire intercept." Id., ¶ 81.

The affidavits further detailed that while some cooperating individuals had been interviewed, further questioning of individuals was unlikely to prove fruitful. A number of individuals involved in the drug organization had histories of violence. Several murders were believed by those close to the organization to be related to the organization's drug activity. Several individuals had indicated that, while they had provided some confidential information, they would refuse to testify because of fear for their safety.

Similarly, the supporting affidavits recounted that "[r]eliable confidential informants and cooperating sources have been identified and developed by your Affiant . . . in regard to this investigation." Id., ¶ 87; R. Vol. 83, doc. 628, tab 4, ¶ 84. However, the organization revealed itself to be "compartmentalized" and "close-natured." Id. The affidavits revealed the use of three cooperating individuals who had some degree of success in infiltrating the organization but whose future usefulness was virtually nil. The first cooperating individual was, at the time of the application, suspected of being an informant and was not able to

make further contact with any members of the drug organization. The second individual was incarcerated on an unrelated charge, and the third individual had apparently ceased to cooperate and had in fact gone back to working with the drug organization. The affidavits adequately established that, due to the close-knit community, as well as the suspicious nature of those involved in the drug organization and the difficulty of introducing anyone new into it, the traditional investigative technique of informants had been tried but was unlikely to meet with further success.

The supporting affidavits also explained the agents' use of surveillance on numerous occasions of various places and subjects, primarily "the manufacturers and distributors of methamphetamine for this organization." R. Vol. 84, doc. 629 tab 7, ¶ 89. They detailed the difficulties encountered in conducting surveillance in the rural area: the officers and their vehicles stood out among the locals; Wright and Cline used sophisticated counter-surveillance techniques; members of the drug organization were familiar with and used back roads where surveillance was difficult or easily detected; surveillance of Cline's business was hampered by the fact that some suspects in the drug organization were county employees and local business persons.

The affidavits detailed the limited success obtained thus far by the use of search warrants. While they had resulted in the seizure of drugs and

methamphetamine laboratories and proceeds, they had failed to uncover the scope of the operations, or identify the sources of the precursor chemicals, the methods of distribution, and other members of the conspiracy.

In sum, we conclude that the district court did not abuse its discretion when it concluded that the government made an adequate showing of necessity for the issuance of the wiretaps in question. Far from being conclusory, the affidavits contain sufficient factual details explaining the traditional investigative techniques used, and why any future use of them would likely be fruitless. They sufficiently explain why the investigative techniques would be futile with respect to Cline, as well as other members of the organization being investigated. Many of the problems the agents encountered investigating the drug organization were not unique to Cline, but applied to the entire organization and its structure, and so the failure to specifically name Cline repeatedly was not fatal to the affidavits.

**B. Sealing of Tapes**

Cline next argues the government failed to timely seal the tapes of the calls intercepted on his home telephone. [4] The statute provides that "[i]mmediately upon the expiration of the period of the order [authorizing the wiretap], or

---

[4]Cline appears to challenge only the timeliness of the sealing of the tape of the wiretap on his own residence, not the tapes of any other wiretaps.

extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions." 18 U.S.C. § 2518(8)(a). The statute further provides that "[t]he presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom." Id.

The order authorizing the wiretap on Cline's residence was issued on February 24, 2000. Telephone calls were intercepted until March 23, 2000. On that same day, DEA agent Rob Ryan, who was the case agent and the wiretap administrator, contacted Assistant U.S. Attorney Allen Litchfield, who was supervising the Oklahoma wiretap. AUSA Litchfield, in turn, contacted the office of United States District Judge Holmes, who had authorized the wiretap on Cline's residence, and stated that the tapes were available. Agent Ryan was told that, because of the judge's schedule, Agent Ryan should appear before the judge on March 30, 2000. Agent Ryan and another AUSA did so, and, on March 30, the tapes were sealed by Judge Holmes. [5]

Cline argues the one week delay is too long and the government has failed to adequately explain that delay, other than to assert that the judge was

_____

[5]AUSA Litchfield did not accompany Agent Ryan on March 30 because he was in trial, so another AUSA accompanied Agent Ryan when the tapes were sealed by Judge Holmes. See R. Vol. 9, doc. 748, attachs. E & F.

unavailable, and this court has never stated whether the issuing judge's unavailability is a satisfactory explanation for such a delay.

"By its clear language, Section 2518(8)(a) requires, as a prerequisite to the admissibility of a recording, that one of two criteria be satisfied: either the recording must have been properly placed under seal, or the government must provide a 'satisfactory explanation' for its failure to comply with the sealing requirement." United States v. Gomez, 67 F.3d 1515, 1523 (10th Cir. 1995) (citing United States v. Ojeda Rios, 495 U.S. 257, 263 (1990)). If the government fails to comply with the statute, the recording and all evidence derived therefrom must be suppressed. Id. Thus, we must consider whether the presentation of the recording for sealing was "immediate" within the meaning of § 2518(8)(a) and, if not, whether the government's explanation of its delay in presentation was "satisfactory" under the statute. We review those questions of statutory interpretation de novo. United States v. Maxwell, 25 F.3d 1389, 1394 (8th Cir. 1994); United States v. Rodriguez, 786 F.2d 472, 476 (2nd Cir. 1986).

The government argues the recordings were immediately "made available" to the judge who issued the wiretap order (Judge Holmes) in the sense that the AUSA immediately contacted the judge and offered to appear at the judge's convenience to present the recordings for sealing. Thus, the government argues, the fact that the recordings were in fact sealed, pursuant to the judge's directions,

some seven days later is irrelevant. We do not need to decide whether the statute requires that the government only make the recordings immediately available for sealing, regardless of when they are in fact sealed, or whether it requires immediate actual sealing. Even if the government failed to comply with the sealing requirement, we find that the government's explanation for the seven-day delay before the tapes were sealed is reasonable.

As indicated, once the wiretap terminated, the government immediately contacted the issuing judge to present the recordings for sealing. The judge informed Agent Ryan and AUSA Litchfield that, due to the judge's scheduling problems, the next available time for the government to present the recordings would be in a week, and directed the AUSA to come back then. R. Vol. 9, doc. 748, attach. E. [6] While the government could have sought another judge to have the recordings sealed, there is no evidence of bad faith and no indication that the recordings were tampered with or that there was any tactical advantage gained by waiting the week to have Judge Holmes seal the tapes. Other courts have similarly accepted the issuing judge's scheduling problems as an acceptable excuse for a delay. See United States v. McGuire, 307 F.3d 1192, 1204 (9th Cir.

---

[6]Agent Ryan's report states that he was instructed to appear before Judge Holmes on "3-20–00." As the government notes in its brief, that is clearly a typographical error, as the date was 3-30-00, as Agent Ryan correctly notes elsewhere in his report.

-17-

2002) ("As we have noted, '[t]he unavailability of the issuing or supervising judge may constitute a satisfactory explanation for a sealing delay.'" (quoting United States v. Pedroni, 958 F.2d 262, 266 (9th Cir. 1992))); Maxwell, 25 F.3d at 1394 ("Intervening weekends, holidays, and the unavailability of the issuing judge are satisfactory explanations for slight delays in presenting wiretap recordings for sealing."); United States v. Ardito, 782 F.2d 358, 362-63 (2d Cir. 1986) (two-day intervening holiday, unavailability of issuing judge, and need to prepare paperwork provided adequate explanation for five-day delay); United States v. Fury, 554 F.2d 522, 533 (2d Cir. 1977) (holding that unavailability of issuing judge excused six-day delay in sealing of tapes). But see Rodriguez, 786 F.2d at 477-78 (holding that absence of issuing judge is no longer an acceptable excuse for failing to have recordings sealed); cf. United States v. Quintero, 38 F.3d 1317, 1330 (3d Cir. 1994) (declining to decide "whether the absence of the supervising judge, in and of itself, is sufficient excuse for any delay in sealing"). We conclude that the district court did not abuse its discretion when it concluded that the government carried its burden of providing a satisfactory explanation for the seven-day delay before the recordings were sealed.

## II. Suppression of Evidence Obtained Following Traffic Stop

As indicated above, an intercepted wiretapped telephone call between Cline and Shane Wright on December 14, 1999, indicated that Cline would be visiting Wright the next day between noon and 2:00 p.m. While agents suspected Cline was a supplier of pseudoephedrine to Wright, nothing in the intercepted call specifically referred to any such delivery. Agents had Cline's business, Biker's Dream, under surveillance, and followed his truck as he headed generally in the direction of Wright's house.

The investigating agents had previously met with a Kansas State trooper, Trooper Grassl, and arranged for him, accompanied by DEA Agent John Aldine, to follow Cline's vehicle. After following Cline's vehicle for several miles, Trooper Grassl observed "Mr. Cline drift[] approximately one to two feet clear across the white line onto the shoulder area of the roadway and then pull[] his vehicle back." R. Vol. 14, doc. 985, at 19. Grassl testified that he thought Cline "was actually going to hit the bridge rail." Id. at 20. Trooper Grassl and Agent Aldine followed Cline's vehicle for another mile and, once he started to turn off the highway on a road towards Wright's house, the trooper activated his flashing lights and pulled Cline over. The weather was clear but windy at the time of the stop.

When the trooper approached Cline's truck and informed Cline that he had stopped him because he had observed him swerve off onto the shoulder of the road, Trooper Grassl testified that Cline "indicated that he was having a little trouble with his vehicle. . . . [H]e said basically something to do with his ball joint – front ball joint appeared to be leaking. He was having some trouble with it pulling." Id. at 23. Grassl obtained Cline's driver's license and returned to his car to run a check on it, while Cline waited in his truck. During some of this time, prior to running a check on Cline's license, Grassl waited while DEA Agent Aldine discussed what to do with other DEA agents.

After running a computer check on Cline's license, the trooper returned the license to Cline, issued him a warning, told him he was free to go, and then asked him if he (Grassl) could ask Cline a few more questions. Cline indicated he could. The traffic stop had lasted approximately eight and one-half minutes by the time Grassl asked Cline's permission to ask a few more questions. Grassl asked if Cline had been drinking or if he had anything illegal in the car, to which Cline responded he did not. Grassl then asked if he could search the vehicle for anything illegal, and Cline said he could. While searching the passenger area of the truck, Grassl removed a jacket lying on the passenger side floorboard. Under the jacket was a paper sack containing two ziplock baggies containing a large

number of white pills which turned out to be pseudoephedrine. Trooper Grassl seized the pills and gave Cline an evidence custody receipt.

Cline argues that the traffic stop was invalid as unsupported by either reasonable suspicion or probable cause. He also argues that the detention exceeded the permissible scope and duration of an investigative detention because several minutes elapsed while Trooper Grassl waited for DEA Agent Aldine to discuss with other DEA agents what course of action to take, prior to Grassl's completion of the routine aspects of the traffic stop. Finally, he argues his consent to search was tainted and invalid because it followed so closely an illegal stop and detention. The district court denied Cline's motion to suppress the pills seized following the traffic stop, finding neither the initial stop, nor the detention nor the search pursuant to Cline's consent contravened the Fourth Amendment.

When reviewing the denial of a motion to suppress, "we accept the factual findings of the district court, and its determination of witness credibility, unless they are clearly erroneous." United States v. Cervine, No. 02-3169, 2003 WL 22407413, at * 2 (10th Cir. Oct. 22, 2003). We view the evidence in the light most favorable to the district court's findings. Id. We review de novo the "ultimate determination of reasonableness under the Fourth Amendment." Id.

## A.  Validity of Initial Stop

We conduct a two-step inquiry when considering the constitutionality of a traffic stop under the Fourth Amendment.  First, we determine "'whether the officer's action was justified at its inception.'"  Id. (quoting United States v. Gonzalez-Lerma, 14 F.3d 1479, 1483 (10th Cir. 1994)).  Second, we consider "'whether the action was reasonably related in scope to the circumstances that first justified the interference.'"  Id. (quoting Gonzalez-Lerma, 14 F.3d at 1483).  "'An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation.'"  Id. (quoting Gonzalez-Lerma, 14 F.3d at 1483).

A valid traffic stop must be "'based on an observed traffic violation'" or a "'reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.'"  United States v. Callarman, 273 F.3d 1284, 1286 (10th Cir. 2001) (quoting United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (en banc)).  In this case, Cline was stopped for violating Kan. Stat. Ann. § 8-1522, which provides that "[w]henever any roadway has been divided into two (2) or more clearly marked lanes for traffic . . . [a] vehicle shall be

driven as nearly as practicable entirely within a single lane."  Kan. Stat. Ann.

§ 8-1522(a). [7]

Cline relies upon our decision in     United States v. Gregory   , 79 F.3d 973

(10th Cir. 1996), and a Kansas district court decision,        United States v. Ochoa   , 4

F. Supp. 2d 1007 (D. Kan. 1998), to argue that a single instance of swerving onto

the shoulder of the road did not constitute a traffic violation.  In        Gregory  we held

that it was not a violation of a Utah traffic statute virtually identical to § 8-1522

for the driver of a U-Haul to swerve one time onto the shoulder of the road, 79 F.

3d at 978, and in   Ochoa  a Kansas district court held that it was not a violation of

section 8-1522 for a driver to drift once onto the shoulder of the road, 4 F. Supp.

2d at 1012.

> As we have subsequently held, however:
>
> decisions like   Gregory  do not establish an absolute standard or
> bright-line rule regarding what conduct constitutes a violation of
> statutes like Kan. Stat. Ann. § 8-1522, but instead highlight the need
> to analyze objectively all the surrounding facts and circumstances to
> determine whether the officer had the probable cause necessary to
> justify the stop.

United States v. Ozbirn    , 189 F.3d 1194, 1198 (10th Cir. 1999).  Thus, in       Gregory ,

the defendant was driving a U-Haul on a mountainous, winding road, in windy

conditions.  79 F.3d at 975.  On those particular facts, we held a single instance

---

[7]See R. Vol. 12, Def.'s Ex. C3 (warning given to Cline for traffic violation, indicating statute violated was "8-1522").

of swerving onto the shoulder did not constitute a traffic violation.        Id. at 978.  In

Ochoa there was no evidence as to weather or road conditions, and the court

found that "the troopers caused or contributed to causing the drift."        Ochoa, 4 F.

Supp. 2d at 1011-12 & n.4.  On those particular facts, the district court held that a

single instance of swerving onto the shoulder was not a violation of section

8-1522.  Id. at 1012.  As  Ozbirn  makes clear, however, neither case stands for the

proposition that a single instance of drifting onto the shoulder can        *never* be a

violation of a traffic statute like section 8-1522, which is what Cline, in effect,

asks us to declare.  Rather, the particular facts and circumstances of each case

determine the result.

As the district court noted, Trooper Grassl testified that, while there was a

brisk wind, it was not significant enough to have caused Cline's truck to swerve.

R. Vol. 14, doc. 985, at 82.  He further testified there was nothing else about the

road conditions that would have caused the swerve and that nearly striking a

bridge abutment was a dangerous driving violation.        Id. at 82-83.  Moreover,

despite Cline's suggestion that the officers may have contributed to Cline's

swerve by following him, the district court found that "[t]here is no convincing

evidence that this occurred here."  Mem. and Order at 16, R. Vol. 8, doc. 940.        [8]

---

[8]The district court's findings with respect to this are as follows:

(continued...)

The fact that Trooper Grassl may have had other motivations in stopping Cline is irrelevant. See Cervine, 2003 WL 22407413, at *4 ("The fact that the troopers had other motivations for stopping Mr. Cervine has no bearing upon this review."). "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." Whren v. United States, 517 U.S. 806, 813 (1996).

In sum, given that Trooper Grassl needed only an articulable suspicion that a traffic violation had occurred, [9] we hold that the initial stop of Cline's truck was reasonable.

---

[8](...continued)
While on the videotape Trooper Grassl is heard telling Cline that he was preparing to pass when he saw Cline swerve, the testimony of Grassl and Agent Aldine is that the patrol car never started to pass the pickup and always maintained a proper following distance. Cline is not heard giving any excuse to Trooper Grassl that he swerved in response to the patrol car. Nor does the court have any basis for saying that a reasonable driver would be distracted by the mere presence of a patrol car operated in a normal manner as to drift one to two feet off the road and nearly strike a bridge railing.

Mem. and Order at 16-17, R. Vol. 8, doc. 940.

[9]As we stated in Cervine, "our case law makes clear that '[w]hile either probable cause or reasonable suspicion is sufficient to justify a traffic stop, only the lesser requirement of reasonable suspicion is necessary.'" Cervine, 2003 WL 22407413, at *3 n.2.

-25-

### B. Validity of Detention

Cline next argues that, even assuming the initial stop was valid, the detention which followed exceeded the permissible scope of a routine traffic stop. He argues that several minutes elapsed prior to the time when Trooper Grassl actually contacted dispatch and transmitted Cline's driver's license information, during which time Agent Aldine was discussing with other DEA agents what course of action to pursue in their investigation of Cline, all of which was unrelated to the traffic violation.

"[T]he Fourth Amendment reasonableness of a traffic stop based on probable cause must be judged by examining both the length of the detention and the manner in which it is carried out." United States v. Holt, 264 F.3d 1215, 1230 (10th Cir. 2001) (en banc). The Supreme Court has stated that, in determining whether a detention is too long, we should "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." United States v. Sharpe, 470 U.S. 675, 686 (1985). Other than the fact that some five minutes elapsed prior to Trooper Grassl's submission of Cline's driver's license to dispatch, nothing else about the detention was unusual or intrusive. Trooper Grassl testified that most traffic stops last between five and ten minutes. Cline's stop lasted approximately eight minutes. While Agent Aldine did, for a few minutes, discuss with DEA agents what course of

action to pursue with respect to Cline, a person they suspected was involved in a methamphetamine drug organization they were investigating, those few minutes did not extend the length of the stop beyond that of a normal traffic stop. We accordingly agree with the district court that the detention was reasonable in scope and duration.

### C. Consent to Search

Cline argues that the consent to search, immediately following what he claims was an unlawful stop and detention, was tainted and therefore invalid. We have held that the stop and detention were both reasonable and valid under the Fourth Amendment. Trooper Grassl had returned Cline's driver's license to him and told him he was free to go. At that point, the trooper asked Cline if he (Grassl) could ask Cline a few more questions. Cline assented. When asked, Cline denied having anything illegal in the truck, and then agreed to let Grassl search the car.

"It has long been established that an officer may conduct a warrantless search consistent with the Fourth Amendment if the challenging party has previously given his or her voluntary consent to that search." United States v. Ringold, 335 F.3d 1168, 1174 (10th Cir. 2003). The district court found "[t]he videotape is convincing evidence that . . . Cline's consent to search the pickup

-27-

was unequivocal and specific and freely given without duress or coercion."  Mem. and Order at 30, R. Vol. 8, doc. 940.  We agree with the district court that Cline's consent was voluntary and freely given.

### III.  Search of House

Cline next argues that the execution of a search warrant at his residence early in the morning of March 27, 2000, violated 18 U.S.C. § 3109 and requires the suppression of all the evidence gathered pursuant to that warrant.  The district court denied Cline's motion to suppress.  On appeal from that denial, "we review the district court's factual findings for clear error, its conclusions of law de novo, and view the evidence in the light most favorable to the prevailing party."  United States v. Gallegos, 314 F.3d 456, 458 (10th Cir. 2002).

The "knock and announce" rule contained in § 3109 "forms a part of the reasonableness inquiry under the Fourth Amendment."  Wilson v. Arkansas, 514 U.S. 927, 929 (1995).  Section 3109 provides that a law enforcement officer may:

> break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of a warrant.

18 U.S.C. § 3109.  The knock and announce requirement may be dispensed with entirely if the police "have a reasonable suspicion that knocking and announcing

-28-

their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." Richards v. Wisconsin, 520 U.S. 385, 394 (1997). When officers do knock and announce, as they did here, "'the amount of time that officers must wait after knocking and announcing depends on the particular facts and circumstances of each case.'" Gallegos, 314 F.3d at 460 (quoting United States v. Jenkins, 175 F.3d 1208, 1213 (10th Cir. 1999)). We have recently stated that "our survey of cases in this circuit has not revealed a single case upholding an interval of less than ten seconds in the absence of exigent circumstances, and our review of cases from other circuits has yielded similar results." Id.

The district court made the following findings concerning the execution of the warrant:

> John Aldine, a DEA Special Agent, was the team leader for this execution. Aldine testified that at approximately 7:30 a.m. on March 27, 2000, Special Agent Robert Allen rapped on Cline's door with one hand and yelled loudly once or twice, "DEA, search warrant." After waiting five to ten seconds thereafter, and hearing no response from inside, Aldine ordered Allen to "hit it." Allen hit the door with a battering ram, the door opened, and eight to ten agents entered Cline's residence with weapons drawn. Both Clines were found in bed, awake but unclothed.

Mem. and Order at 8-9, R. Vol. 8, doc. 983. The district court held the "five to

-29-

ten" second interval between the knock and announce and the forced entry was reasonable under the circumstances, because several developments during the officers' approach to the Clines' residence gave the officers a legitimate concern for their safety and made further delay too risky:

> The evidence was uncontradicted that the executing officers were nervous and apprehensive. Special Agent Aldine testified that their "cavalcade of cars" had been spotted in the small town in which they assembled and had possibly been reported to the Clines by someone on a cell phone that morning as the cars approached the Clines' residence.

> Agents knew, because of authorized wiretaps, that Cline and Johnny Shane Wright were associated, that Wright used and that Clines may have used counter surveillance devices, such as police scanners and cameras mounted at a distance from the house. The agents felt exposed because of the Clines' neighbor's view of their cars on the road near Cline's drive, the possibility that the Clines had a camera mounted near the gate to their residence, and the open area surrounding their immediate approach to the Clines' house.

> Agents were delayed for several minutes by their unsuccessful attempts to break the lock on the gate at Clines' drive, and had to leave their vehicles, which they had anticipated using as cover, at the gate approximately 200-300 yards from the residence. Soon thereafter, agents unsuccessfully attempted to call Timothy Cline out of his house by use of the telephone, while approaching Cline's residence on foot.

> Agents also had information causing them to believe that Cline may be armed and dangerous. . . .

> Based upon the above uncontradicted testimony, the court finds that the Clines could easily have been alerted to the presence of the agents because of the activities that occurred outside the house immediately prior to their entry. <u>It was thus reasonable for the</u>

-30-

<u>agents to believe that their safety had been compromised and further delay was unwarranted</u>.

<u>Id.</u> at 10-11 (emphasis added).

Those findings are amply supported by the testimony at the suppression hearing and are not clearly erroneous.

We conclude that the officers' entry under the circumstances of this case was reasonable. Not only were the officers aware that a prior search of Cline's house had revealed firearms, but they suspected he used counter-surveillance equipment and could be aware of their approach; their approach to his house had taken longer than anticipated and was exposed for the last 200-300 yards, because of the locked gate which they were unable to open; they feared their approach had been relayed to Cline, based upon their observation of a person watching them while talking on a cell phone, as well as a neighbor watching them; their fears were not allayed when they tried to reach Cline by cell phone several times but were unable to. [10] Thus, in this case, these exigencies permitted the officers to enter the house forcibly some ten seconds after knocking and announcing their presence. [11]

---

[10]Agent Aldine testified that he did not seek a no-knock warrant in this case because, when law enforcement personnel had executed a search warrant on Cline's residence in 1994, Cline had put up no resistance.

[11]We note that the Supreme Court has just heard oral argument in a case where the question on which the Court granted certiorari was whether law

(continued...)

-31-

## IV. Prosecutorial Misconduct

Prior to trial, Cline filed a motion *in limine* seeking to prevent the government from presenting any evidence regarding the Clines' pending divorce and Cline's girlfriend. The court denied the motion as moot, in reliance on the government's representation that it did not intend to present any such evidence. The court directed the government not to refer to that evidence without first approaching the bench.

During the trial, Paula Boyd, the former store manager of Biker's Dream, testified regarding two $5,000 cash deposits into the Biker's Dream bank account. She testified that they may have been down payments from Cline on a motorcycle for his granddaughter. When Boyd was recalled the next day to testify further about those payments, it was revealed that in 1999 a motorcycle was sold and title transferred to Cline's granddaughter. Later, the title was transferred back to Biker's Dream. Under questioning by the government, it was revealed that Cline took the motorcycle home to let a friend ride, but not his granddaughter. Cline's

---

[11](...continued) enforcement officers executing a search warrant violated the Fourth Amendment and 18 U.S.C. § 3109 when they forcibly entered a small apartment in the middle of the afternoon fifteen to twenty seconds after knocking and announcing their presence. United States v. Banks, 282 F.3d 699 (9th Cir. 2002), cert. granted, 123 S. Ct. 1252 (U.S. Feb. 24, 2003) (No. 02-473). That case involved no exigent circumstances of any kind, and is accordingly sufficiently distinguishable from this case.

counsel asked whether a grandfather would let his granddaughter ride a motorcycle without proper insurance. The government asked who the friend was, and Boyd revealed that it was Cline's 18-year-old girlfriend. Cline's counsel objected on the ground that it was irrelevant, beyond the scope, and unduly prejudicial under Fed. R. Evid. 403. He did not specifically refer to the court's *in limine* order. The court overruled the objection.

After the jury returned its guilty verdict, Cline filed a motion for judgment of acquittal or, in the alternative, for a new trial, arguing, *inter alia*, that a new trial should be granted because of prosecutorial misconduct in the questioning of Boyd about Cline's girlfriend, in violation of the court's *in limine* order. The district court denied the motion, concluding that, although the government violated the *in limine* order "even though the defendant may have invited the government's questions . . . . [t]he court[] nevertheless[] stands by its evidentiary ruling on the defendant's trial objection which made no reference to the *in limine* order or to the government's violation of the same." Mem. and Order at 11-12, R. Vol. 8, doc. 1576. The court went on to state:

> The ruling is correct in that the evidence was fairly relevant, was not outside the scope of recross examination, and was not unfairly prejudicial. Moreover, the court can find no grounds for believing the government's improper conduct influenced the verdict and, thus, justifies a new trial. The court instructed the jury that the defendant was on trial only for the acts alleged in the superseding indictment and that they were not to be governed by bias or prejudice. Considering the overwhelming evidence of the defendant's

-33-

involvement in the drug conspiracy, the fact that the defendant had a younger girlfriend is insignificant and could not have influenced the jury.

Id. at 12. We review for an abuse of discretion the denial of a defendant's motion for a new trial based on prosecutorial misconduct. United States v. Maynard, 236 F.3d 601, 605 (10th Cir. 2000). We conclude that the district court did not abuse its discretion in denying Cline's motion for a new trial in this case.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denials of Cline's motions to suppress and the denial of his motion for a new trial.